# LARRY TYRONE CARR *v.* STATE OF MARYLAND

[No. 46, September Term, 1978.]

*Decided February 22, 1979.*

*Alfred L. Scanlan, Assigned Public Defender,* with whom

were *Shea & Gardner* and *David B. Cook* on the brief, for appellant.

*Valerie A. Leonhart, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Clarence W. Sharp, Assistant Attorney General,* on the brief, for appellee.

SMITH, J., delivered the opinion of the Court.

We granted the pro se. petition of Larry Tyrone Carr (Carr) for the writ of certiorari in order that we might determine whether under the facts and circumstances of his criminal trial he had a right to obtain and use the written statements of a State's witness for purposes of cross-examination or impeachment. We conclude that he did. The decision of the Court of Special Appeals in *Carr v. State,* 39 Md. App. 478, 387 A. 2d 302 (1978), was to the contrary.

Carr was convicted by a Baltimore City jury of assault with intent to murder, robbery with a deadly weapon, and use of a handgun in the commission of a crime of violence.

Pursuant to Maryland Rule 828 g the parties have agreed to a statement of facts. The facts related here basically are gleaned from that statement.

The victim, Kirk McCall (McCall), testified that he went home to obtain the necessary funds when he and two companions, Raymond Oliver and Larry Lewis, decided to purchase some narcotics. When he rejoined Oliver and Lewis, Carr was also present. McCall related subsequent events, including the production of a gun by Carr, a demand by Carr for money, the striking of Carr in the face by McCall with a cane, the shooting of McCall, and the extraction by Carr of money from McCall's pocket.

Carr claimed that he was not with McCall on the night in question, although he could not remember his exact whereabouts. He produced two witnesses in support of this testimony, Norman Johnson and Marion Harris. Johnson asserted he was in the vicinity when the shooting of McCall took place. He saw McCall lying on the ground immediately after the shooting. He observed a man who "stood over top"

of McCall immediately thereafter. Johnson stated he saw no one else near the victim. He was "positive" that he did not see Carr that night. Harris claimed to have been with Johnson and to have seen McCall some two or three minutes before the shooting when McCall and another man walked past them. He said he had known Carr prior to the night in question but Carr was not McCall's companion. He did not see Carr anywhere in the neighborhood on that night.

The State called Oliver in rebuttal. Although his testimony is said to have differed from McCall's in several details, his version of the events was largely corroborative of McCall's, including a specific identification of Carr as McCall's assailant. Oliver testified on cross-examination that on the morning after the shooting he gave a signed statement to the police in which he specifically referred to Carr. When Oliver was asked if he "personally observe[d] Mr. Carr, the assailant standing over the victim," he equivocated in his answer by saying that he "wanted to get out of the way [; he] went across the street and laid beside the car." Oliver then went on to say:

> I heard Mr. McCall hollering, "Somebody help me."
> When I tried to stand up beside the car, that's when
> I ain't seen nobody. I didn't see nobody at all. Then
> I just picked my crutches — grabbed one of my
> crutches and stood up and went across the street and
> tried to assist him as best I could.

To a question as to whether he saw Lewis, Oliver replied that "Lewis had left too." The record then reflects:

> Q. You didn't see the assailant, he was no longer around?
> A. (No verbal reply; the witness indicated in the negative.)
> Q. So it is your testimony then that after Mr. McCall gave the money back to the assailant, Mr. McCall then struck the assailant with his cane?
> A. Yes, he did.

Q. And as he struck the assailant with his cane he was shot, is that correct?

A. Yes.

Q. All right. Do you know personally that Mr. McCall was shot in the back?

A. Yeah, I know he was shot in the back.

Q. Do you recall in your statement to the police on May 27th, 1975 a statement that the assailant was standing over the victim?

THE COURT: Pardon me?

MR. FLEISCHMANN: Objection, Your Honor. That statement is not in evidence.

THE COURT: Sustained. If you want to use the statement you've got to quote from it, sir. You can't paraphrase it. If you're asking him whether he said something, you have to tell him what he said first, if you're going to use that statement. Yes?

A conference out of the hearing of the jury then took place. As the Court of Special Appeals put it:

Defense counsel responded by stating that although he had information as to the statement's contents, he did not have a copy. When he asked the court to require production of the statement the court refused ruling appellant was entitled to the statement only if it were exculpatory; and he was not entitled to the statement if it were only inconsistent. The court did note that the prosecutor could voluntarily furnish counsel with a copy but the prosecutor refused commenting, "It's too late for that crap." [39 Md. App. at 480.]

The agreed statement of facts states:

On three occasions after the trial judge's ruling, petitioner's trial counsel asked, and Oliver answered, questions as to whether Oliver's statement to the police included specified language. Petitioner's trial

counsel did not ask the trial judge to examine the statement *in camera,* nor did he request that the statement be made part of the record.

The State's attorney said in his opening argument to the jury:

Mr. Oliver was called by the State as a rebuttal witness to rebut the fact that the defendant said, "I couldn't remember. I wasn't there, never saw Kirk McCall." If ever there were two witnesses in diametric opposition, it is the defendant's testimony and that of Mr. Oliver. Mr. Oliver told you point blank that he was no lily white pillar of the community. He's a man who's committed one or two crimes in his time. But that doesn't mean he is going to come in here and directly perjure himself. He told you what happened just the way it did happen.

He commented in the closing argument:

The evidence I submit clearly and unequivocably puts that burden on you to return a conviction on both of the charges for which he is charged on that evidence.

Mr. Oliver knows him and knows him well.

\* \* \*

I submit to you that on the evidence and the identifications in court, Mr. Oliver knowing, in fact, the defendant for some period of years, off and on, seeing him around in the street, various clothing, when he first knew him he didn't have a beard and a goatee, afterwards he did, that on that evidence alone, if none other, the defendant is clearly guilty beyond any reasonable doubt and to a moral certainty, and I submit to you, in .the words of Edmund Burke, an English philosopher about the time of the Revolutionary War, which gave us this great country we have, I would like to leave you with one of his quotes, and it is this, "That all that is

necessary for the triumph of evil is for good men and women to sit and do nothing."

I thank you very much for your time and attention.

*Jencks v. United States,* 353 U. S. 657, 77 S. Ct. 1007, 1 L.Ed.2d 1103 (1957), is a landmark case insofar as discovery in criminal matters is concerned. Jencks had filed an affidavit with the National Labor Relations Board stating that he was not a Communist. In a subsequent trial the issue was whether he had been a member of the Communist Party and thus had filed a false affidavit. After two government informants had testified against him, Jencks moved for an order directing the Federal Bureau of Investigation to make its reports available to him. The government opposed the motion on the ground that Jencks had failed to make "a preliminary foundation . . . of inconsistency between the contents of the reports and the testimony [of the witnesses]." *Id.* at 666. The trial judge refused to grant the motion, an action that was affirmed on direct appeal. The Supreme Court saw two parts to the problem, whether Jencks had a right to see the statements at all, and, if so, how he should go about obtaining them. The Court noted that the issue was not whether the statements were admissible, but whether they were subject to a disclosure order, stating, " 'For production purposes, it need only appear that the evidence is relevant, competent, and outside of any exclusionary rule . . . .' [*Gordon v. United States,*] 344 U. S. [414] at 420 [, 73 S. Ct. 369, 97 L.Ed. 447 (1953)]." *Id.* at 667. It then went on to say:

> The crucial nature of the testimony of Ford and Matusow to the Government's case is conspicuously apparent. The impeachment of that testimony was singularly important to the petitioner. The value of the reports for impeachment purposes was highlighted by the admissions of both witnesses that they could not remember what reports were oral and what written, and by Matusow's admission: "I don't recall what I put in my reports two or three years ago, written or oral, I don't know what they were."
>
> Every experienced trial judge and trial lawyer

knows the value for impeaching purposes of statements of the witness recording the events before time dulls treacherous memory. Flat contradiction between the witness' testimony and the version of the events given in his reports is not the only test of inconsistency. The omission from the reports of facts related at the trial, or a contrast in emphasis upon the same facts, even a different order of treatment, are also relevant to the cross-examining process of testing the credibility of a witness' trial testimony. [*Id.* at 667.]

The Court rejected a requirement that prior to obtaining such statements the accused must show conflict between the reports and the testimony actually given, saying that such would "deny the accused evidence relevant and material to his defense." *Id.* at 667. It added that such a requirement "would be clearly incompatible with [its] standards for the administration of criminal justice in the federal courts and must therefore be rejected." *Id.* at 668. Mr. Justice Brennan said for the Court:

We now hold that the petitioner was entitled to an order directing the Government to produce for inspection all reports of Matusow and Ford in its possession, written and, when orally made, as recorded by the F. B. I., touching the events and activities as to which they testified at the trial. We hold, further, that the petitioner is entitled to inspect the reports to decide whether to use them in his defense. [*Id.* at 668.]

The Court specifically disapproved a "practice of producing government documents to the trial judge for his determination of relevancy ... without hearing the accused ...." *Id.* at 669. The decision in *Jencks* was not constitutionally based but involved the supervisory jurisdiction of the Supreme Court over the federal courts. *Palermo v. United States,* 360 U. S. 343, 350, 79 S. Ct. 1217, 3 L.Ed.2d 1287 (1959). 18 U.S.C. § 3500 now sets forth the standard to be followed in such matters in the federal courts.

A related, but not analogous, issue was before this Court in *Brady v. State,* 226 Md. 422, 174 A. 2d 167 (1961). Two people were involved in a killing. Brady was tried first. This Court affirmed his conviction. *Brady v. State,* 220 Md. 454, 154 A. 2d 434 (1959). The matter again reached here on an appeal from a denial of post conviction relief. Brady contended that he was deprived of a fair trial by reason of the fact that the State did not disclose at or before his trial that it then had in its possession a statement of his accomplice admitting that the accomplice had actually strangled the victim. At the trial of the accomplice the State had offered the unsigned statement, which was rejected by the trial court because it was unsigned. In prior statements the accomplice had stated that Brady did the killing and he so testified at Brady's trial. Although these prior statements were made available to Brady's counsel before trial, the one in which the accomplice said that he had done the actual killing was neither made available prior to trial nor was it produced or offered at trial. Chief Judge Brune reviewed for the Court the various theories under which this undisclosed statement might have been used. The Court "conclude[d] that the withholding of this particular confession of [the accomplice] was prejudicial to the defendant Brady," further observing, however, that if the "withheld confession had been before the jury, nothing in it could have reduced the appellant Brady's offense below murder in the first degree." For that reason it did not grant a new trial on guilt but held Brady was "entitled to have a jury impaneled to determine whether the finding already made of guilty of murder in the first degree should or should not be modified by the addition of the words 'without capital punishment' . . . ."

Brady was not satisfied with what amounted to a new trial on the issue of punishment only. Accordingly, he sought and obtained further review by the Supreme Court. *Brady v. Maryland,* 373 U. S. 83, 86, 83 S. Ct. 1194, 10 L.Ed.2d 215 (1963). That opinion states:

> Prior to the trial petitioner's counsel had requested the prosecution to allow him to examine Boblit's extrajudicial statements. Several of those

statements were shown to him; but one dated July 9, 1958, in which Boblit admitted the actual homicide, was withheld by the prosecution and did not come to petitioner's notice until after he had been tried, convicted, and sentenced, and after his conviction had been affirmed. [*Id.* at 84.]

The fact of the request by counsel for examination of these statements cannot be gleaned from the opinion of this Court. The Supreme Court said it agreed with this Court that "suppression of this confession was a violation of the Due Process Clause of the Fourteenth Amendment." It went on to "hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87.

*Giglio v. United States,* 405 U. S. 150, 92 S. Ct. 763, 31 L.Ed.2d 104 (1972), involved a forged check scheme. An accomplice testified against Giglio at Giglio's trial. He denied on cross-examination that he had been promised immunity if he implicated someone else. It was later learned that such a promise had been made. In holding that Giglio had been denied due process, Chief Justice Burger said for a unanimous Court:

Here the Government's case depended almost entirely on Taliento's testimony; without it there could have been no indictment and no evidence to carry the case to the jury. Taliento's credibility as a witness was therefore an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it. [*Id.* at 154-55.]

While *Brady v. Maryland* and *Giglio,* among other cases, established that the prosecution was under a duty to disclose to the defense information favorable to it, questions remained as to the extent of the duty to disclose. A particularly perplexing issue was that of "materiality," *i.e.* how to

determine when the non-disclosure by the prosecution so damaged the defendant's case that his right to a fair trial was violated and a new trial warranted. *Compare Giles v. Maryland,* 386 U. S. 66, 87 S. Ct. 793, 17 L.Ed.2d 737 (1967), *with State v. Giles,* 239 Md. 458, 212 A. 2d 101 (1965) (information concerning mental stability and sexual habits of prosecutrix in rape case: this Court (with dissent) found it not material; Supreme Court (with dissent) found a slightly more ample record to indicate non-disclosure was material). This issue was addressed in detail by the Supreme Court in *United States v. Agurs,* 427 U. S. 97, 96 S. Ct. 2392, 49 L.Ed.2d 342 (1976). At issue in that case was the contention of the defendant in a murder case that the prosecution should have volunteered to her the prior criminal record of the victim. She claimed it evidenced his violent character which might have given credence to her claim that she acted in self-defense. The Court held "that the prosecutor's failure to tender [the victim's] record to the defense did not deprive respondent of a fair trial as guaranteed by the Due Process Clause of the Fifth Amendment." Mr. Justice Stevens said for the Court in *Agurs* that the rule of *Brady* "arguably applies in three quite different situations," each of which "involves the discovery, after trial, of information which had been known to the prosecution but unknown to the defense." *Mooney v. Holohan,* 294 U. S. 103, 55 S. Ct. 340, 79 L. Ed. 791 (1935), and *Giglio* were said to typify the first situation, that where "the undisclosed evidence demonstrates that the prosecution's case includes perjured testimony and that the prosecution knew, or should have known, of the perjury." He said for the Court, "In those cases the Court has applied a strict standard of materiality, not just because they involve prosecutorial misconduct, but more importantly because they involve a corruption of the truth-seeking function of the trial process." The second type of case was regarded as illustrated by *Brady* and "is characterized by a pretrial request for specific evidence." The same test of strict materiality developed in the *Giglio* type cases applies. The Court said, "A fair analysis of the holding in *Brady* indicates that implicit in the requirement of materiality is a concern that the suppressed evidence might

have affected the outcome of the trial." Relative to this class of cases, the Court stated:

> In *Brady* the request was specific. It gave the prosecutor notice of exactly what the defense desired. Although there is, of course, no duty to provide defense counsel with unlimited discovery of everything known by the prosecutor, if the subject matter of such a request is material, or indeed if a substantial basis for claiming materiality exists, it is reasonable to require the prosecutor to respond either by furnishing the information or by submitting the problem to the trial judge. When the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable. [*Id.* at 106.]

The Court further said, "The third situation in which the *Brady* rule arguably applies, typified by [*Agurs*] . . . embraces the case in which only a general request for '*Brady* material' has been made." The Court rejected a standard of requiring disclosure of "everything that might influence a jury" because "the only way a prosecutor could [then] discharge his constitutional duty would be to allow complete discovery of his files as a matter of routine practice." It likewise rejected measuring "the constitutional obligation . . . by the moral culpability, or the willfulness of the prosecutor." It said:

> The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional

evidence of relatively minor importance might be sufficient to create a reasonable doubt. [*Id.* at 112-13.]

Ten years before *Jencks* this Court in *State v. Haas,* 188 Md. 63, 51 A. 2d 647 (1947), held that a trial court did not abuse its discretion when it required the State to furnish defense counsel copies of written confessions which the State had obtained from the defendant and which the State presumably intended to use at trial. Although this Court held as it did in *Haas* and there were other instances of discovery accorded the defense at the trial level, the right of discovery, except in a very limited sense, was not officially a part of the Maryland system until the adoption of revised criminal rules by this Court on September 15, 1961, effective January 1, 1962. This brought a new Maryland Rule 728.[1] It was that rule which was applicable at the time of the trial of this case.[2] It provided that, upon motion of a defendant "and upon a showing that the items sought m[ight] be material to the preparation of his defense and that the request is reasonable," a defendant might obtain an order upon the State's Attorney "or other person" to produce and permit the defendant to inspect and copy or photograph designated books, papers, documents or tangible objects obtained from or belonging to him or obtained from others by seizure or by process; to furnish the defendant the substance of any oral statement made by him which the State might propose to produce as evidence to prove its case in chief, a copy of any written statement made by him and the substance of any oral confession made by him; and to furnish the defendant a list of the names and addresses of the witnesses whom the State intends to call to prove its case in chief. Provision was made in the rule for a specification in the order of the time, place

---

1. The prior Maryland Rule 728 was limited to an order upon the State's Attorney upon motion of a defendant "to permit the defendant to inspect and copy or photograph designated books, papers, documents, or tangible objects, including written statements by the defendant, obtained from or belonging to the defendant or obtained from others by seizure or by process, upon a showing that the items sought might be material to the preparation of his defense and that the request is reasonable."

2. Rule 728 has now been supplanted by Rule 741.

and manner of making such production, etc. The concluding paragraph of the rule was that nothing in it was to "limit the inherent power of the court to require or permit discovery." This Court has said, "The main objectives of Rule 728 [were] to assist the defendant in preparing his defense, and to protect him from surprise. *Cropper v. State,* 233 Md. 384 [, 197 A. 2d 112 (1964)]." *Mayson v. State,* 238 Md. 283, 287, 208 A. 2d 599 (1965).

In *McKenzie v. State,* 236 Md. 597, 204 A. 2d 678 (1964), our predecessors were faced with a contention on the part of a defendant that a trial court denied him equal protection and due process when it refused at the beginning of trial to order the State to produce written statements of the two complaining witnesses. Judge Sybert there said for the Court:

> The appellant admits in his brief that his request was beyond the scope of Maryland Rule 728 dealing with discovery in criminal cases. We have stated consistently that a request for the production of documents or statements in the possession or control of the State is within the sound discretion of the trial court. [Citing cases.] Here, the defense failed to state adequate reasons for the request or to state what it was hoped the statements would show if produced. It would seem that the request was nothing more than a "fishing expedition". Moreover, it is not entirely clear that the statements in fact existed at the time of trial, and, even if their existence be assumed, who had possession of them. The State's Attorney throughout the trial denied any knowledge of such statements. Upon the facts before us we do not believe the trial court abused its discretion. [*Id.* at 602-03.]

In *Veney v. State,* 251 Md. 159, 246 A. 2d 608 (1968), *cert. denied,* 394 U. S. 948 (1969), a motion was made by the accused for discovery and inspection of all written statements of his three codefendants. He also contended that the State should say when and where oral statements made by him were made and that he should be furnished with reports of any experts

whom the State intended to call at the trial of the case. As to the last two points we said simply, "Maryland rules require no such disclosure." On the first point we quoted from *McKenzie* and found no abuse of discretion by the trial court.

In *Austin v. State,* 253 Md. 313, 252 A. 2d 797 (1969), Judge Finan said for the Court that "[a]lthough we d[id] not have a *Brady* or *Giles* [*v. Maryland,* 386 U. S. 66, 87 S. Ct. 793, 17 L.Ed.2d 737 (1967),] situation, none the less responsibility of the State 'to provide a fair trial under the Due Process Clause' still persists and it would appear to us to have required the admission of the report [in question]." He referred to a police report, the substance of which we said "was quite relevant to the central issue in [the] case, namely, the question of the identification of the accused." At the trial the defense read into the record the testimony of an individual, then deceased, as taken from the transcript of a prior trial. He there testified relative to his observations of the robbery in question, but he had been unable to identify either of the two culprits. Counsel then sought to call a police officer as a witness to testify that immediately after the crime he had interviewed the deceased witness, writing a departmental report subsequent to the interview. It was sought to offer the report into evidence as showing that the police officer had received from the deceased witness a description of the two robbers materially differing from that given the police by the victim, "a description also possibly different from that of the appearance of the appellant himself . . . ." It was urged this should be admitted as part of the res gestae. Judge Finan concluded for the Court by stating:

> Insofar as the effect it may have on the right of the accused to a fair trial, we see no basic distinction between evidence the State willfully fails to disclose and that withheld because of an erroneous evaluation by the court as to its relevancy. In both instances the accused may be prejudiced by the evidence being withheld from the jury. We are persuaded that the report, for whatever weight the jury may have assigned to it, was relevant to the case and, if for no other reason than that of

fundamental fairness to the accused, should have been admitted into evidence. [*Id.* at 319.]

In *Couser v. State,* 282 Md. 125, 383 A. 2d 389 (1978), we found no error on the part of a trial judge who declined to direct the prosecutor to make available to counsel for the defendant for his assistance in selecting the jury the prosecutor's "jury dossier consist[ing] primarily of information compiled by the prosecutor from prior voir dire examinations and past voting records." However, in that case Chief Judge Murphy said for the Court:

> While properly concluding that the appellant's assertion of an absolute right to inspect this data was not well founded, the trial judge required disclosure of the criminal records of prospective jurors contained in the dossier; he also required that the prosecutor disclose any instances known to him in which a prospective juror may have lied under oath on his voir dire examination. He thus inferentially recognized, we think correctly, that a prosecutor is under a duty to disclose information within his knowledge which would show that a prospective juror holds a fixed prejudice or bias against an accused which would support a challenge for cause. It is not to be assumed, of course, that because no such information was revealed, it did, in fact, exist but was wrongfully withheld by the prosecutor. [*Id.* at 140-41.]

It is of interest here that the *ABA Standards Relating to the Administration of Criminal Justice, Discovery & Procedure Before Trial,* 11-2.1 (2d ed. Tent. Draft 1978) provides for the prosecution to "disclose to defense counsel all of the material and information within the prosecutor's possession or control including . . . the names and addresses of witnesses, together with their relevant written or recorded statements . . . ." The commentary states relative to this:

> Pretrial discovery of witness statements is prohibited in federal prosecutions and in some state

jurisdictions. However, the witness statements are usually available to the defense after the witness testifies at a hearing or trial.

While some state jurisdictions require pretrial disclosure of witness statements, others treat the pretrial disclosure of witness statements as a matter for the sound discretion of the trial court.

Where protective orders are available for special cases, the routine pretrial disclosure of witness statements permits the defendant to prepare for trial without burdening the prosecutor and the judge with pro forma motion practice. As a result, routine disclosure provisions have been incorporated in the National Advisory Commission standards, the National Prosecution Standards, and the Uniform Rules of Criminal Procedure, as well as in these standards. [*Id.* at 7.]

ABA's *Discovery and Procedure Before Trial* § 2.1 (Approved Draft 1970) is virtually identical. The joint committees of the Maryland Judicial Conference and the Maryland State Bar Association to implement that standard said in the commentary on their Report and Recommendation (1974):

Although court-ordered discovery . . . plays a very limited role in criminal cases, actual practice with respect to discovery varies widely. Many State's Attorneys follow an open files policy that gives defense counsel access to all the information in the State's Attorney's file other than the grand jury minutes. While this is often a highly discretionary procedure that a State's Attorney may follow in some cases but not in others, the State's Attorney in at least some counties employ it routinely. [*Id.* at 16.]

They recommended amendment to Rule 728 so that upon request a State's Attorney would be obliged to supply "[t]he names and addresses of the witnesses whom [he] intends to call to prove his case in chief, together with their relevant

written or recorded statements." *Id.* at 12. Our Rule 741, which we adopted January 31, 1977, effective July 1, 1977, to replace the former Rule 728, is more liberal in discovery matters than the former rule. It does not, however, make specifically available to defense counsel any statements made by witnesses.

*Davis v. Alaska,* 415 U. S. 308, 94 S. Ct. 1105, 39 L.Ed.2d 347 (1974), is factually somewhat analogous to the case at bar. A key prosecution witness there was on probation as a juvenile offender. Before testimony was taken at the trial the prosecution moved for a protective order to prevent any reference by the defense in the course of cross-examination to the juvenile record of this witness. Defense counsel opposed the protective order. In the words of the Court he "made it clear that he would not introduce [the witness'] juvenile adjudication as a general impeachment of [his] character as a truthful person but rather, to show specifically that at the same time [the witness] was assisting the police in identifying [the defendant] he was on probation for robbery." From this he intended to show that the witness "acted out of fear or concern of possible jeopardy to his probation," that "[n]ot only might [he] have made a hasty and faulty identification of [the defendant] to shift suspicion away from himself as one who robbed the [place in question], but [the witness] might have been subject to undue pressure from the police and made his identifications under fear of possible probation revocation." An Alaska statute prevented disclosure of the juvenile record. The trial judge refused to allow the record of the witness to be brought before the jury. The Supreme Court's grant of certiorari was "limited to the question of whether petitioner was denied his right under the Confrontation Clause to adequately cross-examine [the witness] . . . ." Chief Justice Burger said for a unanimous Court:

> We cannot accept the Alaska Supreme Court's conclusion that the cross-examination that was permitted defense counsel was adequate to develop the issue of bias properly to the jury. While counsel was permitted to ask Green *whether* he was biased,

counsel was unable to make a record from which to argue *why* Green might have been biased or otherwise lacked that degree of impartiality expected of a witness at trial. On the basis of the limited cross-examination that was permitted, the jury might well have thought that defense counsel was engaged in a speculative and baseless line of attack on the credibility of an apparently blameless witness or, as the prosecutor's objection put it, a "rehash" of prior cross-examination. On these facts it seems clear to us that to make any such inquiry effective, defense counsel should have been permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness. Petitioner was thus denied the right of effective cross-examination which " 'would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it.' *Brookhart v. Janis,* 384 U.S. 1, 3." *Smith v. Illinois,* 390 U.S. 129, 131 (1968). [*Id.* at 318 (emphasis in original).]

The statement in controversy here could not have been obtained under Rule 728 had discovery proceedings been instituted prior to trial. The fact that defense counsel was so thoroughly familiar with the statement no doubt came about by the "open file" policy followed by many State's Attorneys to which reference was made in the joint committee report we have quoted. In this case Oliver was a very important witness. His testimony was crucial, as evidenced by that portion of the argument of the State to the jury which we have quoted. We have here no "fishing expedition" in advance of trial. We have testimony on matters involving identity which may be inconsistent with the prior signed statement by this witness. It was then that trial counsel made his request for this signed statement. Every skilled trial advocate knows the crucial importance in such situations of cross-examination. Effective cross-examination here made it necessary that defense counsel be permitted to directly confront the witness with his

inconsistent prior statement. To deny to defense counsel the tool necessary for such adequate cross-examination under these circumstances amounts in our view to a denial to the defendant of due process of law. Hence, a new trial is mandated.

*Judgment of the Court of Special Appeals reversed and case remanded to that court with instructions to reverse the judgment of the Criminal Court of Baltimore and to remand the case to that court for a new trial; the Mayor and City Council of Baltimore to pay the costs.*