474 A.2d 931

**Napoleon Carlton GARRETT**

**v.**

**STATE of Maryland.**

**No. 1021, Sept. Term, 1983.**

Court of Special Appeals of Maryland.

May 9, 1984.

Certiorari Denied Aug. 20, 1984.

98

Victor L. Crawford, Rockville, for appellant.

Ann E. Singleton, Asst. Atty. Gen., with whom were Stephen H. Sachs, Atty. Gen., Andrew L. Sonner, State's Atty., for Montgomery County and Robert Dean, Asst. State's Atty., for Montgomery County on brief, for appellee.

Argued before WILNER, WEANT and BISHOP, JJ.

WILNER, Judge.

At about 2:30 in the morning of January 5, 1981, three men gained entry to the home shared by Samuel Hughes and his fiance Karen Hackney. While Hackney was held at gunpoint in the downstairs den, Hughes was led upstairs to his bedroom and forced to open a safe. He was then taken back downstairs, where he and Hackney had their hands bound behind their backs and were required to lie down next to each other in prone position. Their heads were covered with various bedding items—pillow, sheets, and sleeping bags. Eventually, someone shot Ms. Hackney in the head five times. It is not clear whether any of those shots were intended for Hughes. The three men then left, taking with them cash, drugs, and other valuable items.

Hughes identified both Emmit Brown, whom he knew, and appellant as two of the armed intruders. Brown, arrested within hours, also implicated appellant and a warrant was issued for his arrest.

Six weeks after this event, appellant was arrested in New Jersey in connection with an armed robbery which occurred in that State. He gave the New Jersey police a false name and address. It was not until late 1982 that the Maryland authorities discovered his whereabouts and ultimately obtained custody of him. He was brought to trial in the Circuit Court for Montgomery County, and, on May 4, 1983, was convicted of first degree murder, two counts of armed robbery, and two counts of using a handgun in a crime of violence. From the judgments entered upon those convictions, appellant brings this appeal, complaining that (1) the court erred in refusing to permit defense counsel to inspect the grand jury testimony of Detective Barry Collier after Collier's in-court testimony on direct examination, and (2) the court erred in admitting evidence and instructing the jury upon appellant's use of a false name and address in New Jersey.

Coupled with appellant's appeal is the State's cross-appeal with respect to the sentence imposed. The State moved the

court to impose a mandatory twenty-five year sentence without possibility of parole, pursuant to Md.Code Ann. art. 27, § 643B(c), and complains of the court's refusal to invoke that statute.

Although we agree, and indeed the State concedes, that the court erred in rejecting counsel's request to inspect Collier's grand jury testimony, we shall nevertheless affirm.

## (1) *Grand Jury Testimony*

The circumstances surrounding the shooting of Ms. Hackney were somewhat unusual and were by no means beyond dispute. To some extent, they suggested the possibility that Hughes may have shot his fiancee, and that, indeed, was argued to the jury.

There was considerable evidence that Hughes was involved in drug trafficking. He admitted to having two or more pounds of marijuana in his home at the time of the shooting, as well as to having dealt in that product with Emmit Brown in the past. According to Hughes, when Brown knocked on the door at 2:30 in the morning, Ms. Hackney was vacuum cleaning the living room, and he was in the process of shampooing his hair. Hughes's sister and her nine-year old daughter were asleep in one of the bedrooms; yet, despite the vacuum cleaner, the shampooing, the movement throughout the house by the three intruders, and the firing of five shots, they were not awakened. Finally, ballistics analyses established that the bullets that killed Ms. Hackney were fired from either a .38 caliber or .357 magnum pistol. Hughes admitted to owning and having in his house both a .38 caliber and a .357 magnum pistol, that he claimed the intruders took. Although he denied having fired any guns on the day in question, a neutron activation analysis revealed traces of barium and antimony on both of his hands, those materials being indicative of gunshot residue.

On the other hand, depending upon the credibility of two State's witnesses, the case against appellant was a strong one. Hughes positively identified appellant as one of the

three intruders, the one who accompanied Hughes upstairs to open the safe and who removed certain jewelry from Ms. Hackney before she was shot. Douglas Dawkins, an acquaintance of appellant for some four or five years, testified that he had seen appellant in New Jersey in 1981, and that appellant had admitted not only the robbery but to shooting "the female." According to Dawkins, appellant stated that he was with two other men, both named Brown, and that he shot the woman five or six times because she knew him. The story relayed by Dawkins, though brief, corroborated some of the details testified to by Hughes. In addition, photographs of the crime scene taken by the police showed the position and condition of Ms. Hackney's body as Hughes described it, *i.e.,* her hands were tied with plastic cord and she was covered with various items of bedding.

A number of police officers testified, although they added little to the basic story related by Hughes. Essentially, they described the crime scene and identified certain items of evidence collected by them.

On March 2, 1983—two months before trial—appellant asked the court to direct the State to "transcribe the Grand Jury testimony of all witnesses who will be called to testify at the trial." No request was made, at that time, to inspect any such testimony. The State opposed the motion on the ground that the only purpose for a transcription would be to provide access to appellant and that appellant had failed to establish a "particularized need" for such access. The court (Judge Raker) granted the motion. On April 17, 1983, it ordered that all grand jury proceedings in the case be transcribed prior to May 2, 1983, and that the cost of the transcription be paid by the public defender, a condition to which the public defender had agreed. Pursuant to that order, the grand jury testimony of Detective Barry Collier was transcribed and was in the possession of the prosecutor at time of trial.

Collier was one of five police officers who investigated the shooting; he was the last of the five to testify at trial.

On direct examination he: (1) confirmed that certain photographs which had already been admitted into evidence without objection accurately depicted the scene of the crime as he had observed it, (2) stated that he had assisted Detective Arnold in collecting evidence at the scene, (3) stated that he was present at the autopsy performed on Ms. Hackney, and identified certain items of clothing and bullet fragments removed from her at that time, all of which were admitted into evidence without objection, and (4) identified a .25 caliber pistol taken from Emmit Brown at the time of his arrest, the pistol having previously been placed into evidence without objection.

On cross-examination, Collier acknowledged that he was "one of the chief investigators" in the case and that his duties included the gathering of evidence and the delivery of certain items to the Federal Bureau of Alcohol, Tobacco and Firearms for analysis. He identified, from a list shown him by defense counsel, the items taken to that agency, including the victim's clothing, bullets and bullet fragments, carpet samples, a blanket and a pillow, the handgun taken from Emmit Brown, and the neutron analysis kit containing the swabbings from Hughes's hands. The items themselves had already been placed into evidence and identified by the expert witness from the Bureau of Alcohol, Tobacco and Firearms. Finally, Collier acknowledged having testified before the grand jury.

When nearly finished with cross-examination of Detective Collier, counsel, for the first time, asked to see his grand jury testimony, calling the court's attention to Judge Raker's pre-trial order. The court, however, summarily and, in our judgment, erroneously denied the request. The colloquy following counsel's request was as follows:

"THE COURT: I don't need a bench conference to deal with this. We can take a lunch recess. Have you finished cross-examining him?

MS. DUROVIC [Defense Counsel]: Well, Your Honor, I can't make that determination because I have to first

request from the Court what I'd like, which is, I'd like a copy of his grand jury testimony.

THE COURT: I don't know where his grand jury testimony is. You know as well as I do that they don't get that transcribed right away.

MS. DUROVIC: Judge Raker ordered that it be transcribed.

MR. DEAN [State's Attorney]: Your Honor, could we have arguments at the bench. I think it would be more appropriate at the bench.

THE COURT: Well does the bench transcribe?

MS. DUROVIC: Your Honor, Judge Raker ordered—

THE COURT: Wait a minute. You already said that once. I don't need to hear that again.

MS. DUROVIC: I don't know, Your Honor.

THE COURT: All right. Well I don't have anything to produce because no one knows where it is. So, do you have any other questions of him?

MS. DUROVIC: Your Honor, we would ask that the Court inquire of the State as to whether, in fact, the grand jury transcripts have been transcribed in compliance with Judge Raker's order.

THE COURT: I'm not going to ask him that right now. Do you [apparently referring to the prosecutor] have any other questions of this witness?"

Throughout this colloquy, the prosecutor, *who had the grand jury transcript in his possession,* inexplicably remained mute, thereby permitting the court to labor under the impression that the transcript was not available. Responding to the court's invitation, the prosecutor then asked a few more questions on redirect, following which defense counsel engaged in brief recross examination. The court then excused the jury for lunch, and the conversation regarding the grand jury transcripts continued:

"THE COURT: ...

Ms. Durovic, you want to make a big point out of Judge Raker's order in connection with this matter, in these

grand jury proceedings. There's a docket entry in here number 56 that says, 'Hearing on defendant's motion for appropriate relief, Raker, J., granted. Proceedings of grand jury not already transcribed are to be transcribed. Office of public defender to pay cost of transcript. Court denies defendant access to transcript. Order to be submitted.'

'On April 18th, 1983 your order of Court, Raker, J., that expense for transcribing portion of the grand jury proceeding shall be paid for by the public defender's office file'

Now, I don't know where those transcripts are but I do object to the fact that you make a big point about it in front of the jury when it's obviously the public defender's office responsibility to see that they are transcribed and paid for.

MS. DUROVIC: Your Honor, excuse me.

THE COURT: Now, I don't want to hear anything more about this.

MS. DUROVIC: Your Honor, let me just make this clear for the record.

THE COURT: I don't want to hear anything more.

MS. DUROVIC: The state was—

THE COURT: Ms. Durovic, I said I don't want to hear anything more about it.

MS. DUROVIC: Your Honor, I've got to make a record.

THE COURT: Listen, can you hear? You just keep quiet a minute. You're trying to embarrass the Court in front of the jury. Now, I don't know whether the public defender's office made arrangements to get that transcribing done. If they didn't, you should make sure that it was done.

The transcript of the proceedings is not here with the jacket and I object to the fact that you keep insisting upon the fact that I should have this transcript. I had nothing to do with the transcript, if it were going to be

prepared it was the responsibility of your office to see that it got prepared and I don't want to hear anything more about it."

At that point, the prosecutor finally advised the court that, in accordance with Judge Raker's order, he had directed the grand jury stenographer to prepare a transcript of the testimony taken before the grand jury, and that he had in fact received and had available the transcript of Detective Collier's testimony. He nevertheless, for the first time at trial, formally objected to defense counsel having access to it because "there's no showing of a particularized need for the transcripts." In response, counsel called the court's attention to *Leonard v. State*, 46 Md.App. 631, 421 A.2d 85 (1980), *aff'd* 290 Md. 295, 429 A.2d 538 (1981), to which the court responded, "I don't know about that, there's already an order in the Court that says you're not to have that." That ended the discussion on the matter.

At the time of trial in this case, it was clear from *Carr v. State*, 284 Md. 455, 397 A.2d 606 (1979), and *Leonard v. State, supra*, that once a State's witness has testified on direct examination, defense counsel is entitled to inspect any prior written statement given by the witness that is relevant to his testimony and that is available, for possible use in cross-examination. That right of inspection, it was said in both *Carr* and *Leonard*, is not limited either by the pre-trial discovery rules or to statements that are merely exculpatory in nature. The purpose of the inspection is for counsel to determine whether the earlier statement is in any material way inconsistent with the witness's trial testimony and so may be used to impeach the credibility of the witness.

Neither *Carr* nor *Leonard* dealt specifically with grand jury testimony, although in *Erman v. State*, 49 Md.App. 605, 618, 434 A.2d 1030 (1981), *cert. denied* 456 U.S. 908, 102 S.Ct. 1756, 72 L.Ed.2d 165 (1982), we suggested (without deciding) that, on the basis of a statement in *Attorney Griev. Comm'n v. Strathen*, 287 Md. 111, 117, 411 A.2d 102

(1980), the principle announced in *Carr* and *Leonard* may well apply to such testimony. That suggestion was made again in *Gillis v. State*, 53 Md.App. 691, 695, 456 A.2d 89, *cert. denied* 296 Md. 172 (1983), decided three months before the trial in this case.

All doubt about the matter was put to rest by *Jones v. State*, 297 Md. 7, 464 A.2d 977 (1983), decided shortly after the trial here. In *Jones*, the Court of Appeals held explicitly that "after a State's witness has testified on direct examination, a defendant is entitled to inspect [that witness's] grand jury testimony for cross-examination purposes without any requirement that he show any other need." *Id.* at 15, 464 A.2d 977. That ruling, said the Court in addressing the State's motion for reconsideration, was based on "common law principles of procedure and evidence" and did *not* represent a change in the law. *Id.* at 24, 464 A.2d 977. It merely "explained the 'particularized need' referred to in *Strathen.*"

Under *Jones*, therefore, if not under *Carr, Leonard, Erman,* and *Gillis*, it is clear that appellant was entitled to inspect Detective Collier's grand jury testimony, which had been transcribed and was available, and that the court erred in refusing to permit that inspection. The question raised by the State is whether, under the circumstances of this case, that error was harmless.

In determining whether an error is harmless, we look to see whether "the erroneous ruling, in relation to the totality of the evidence, played a significant role in influencing the rendition of the verdict, to the prejudice of the appellant." *Dorsey v. State*, 276 Md. 638, 653, 350 A.2d 665 (1976). Unless we, "upon [our] own independent review of the record, [are] able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed 'harmless' and a reversal is mandated." *Id.* at 659, 350 A.2d 665. *See also Spence v. State*, 296 Md. 416, 425, n. 2, 463 A.2d 808 (1983); *Huffington v. State*, 295 Md. 1, 16, 452 A.2d 1211 (1982).

In *Jones v. State, supra,* the defendant had sought the grand jury testimony of the State's two principal witnesses. According to the briefs filed in the case, one of the witnesses, Lawson, was an independent eyewitness to the robbery and shooting with which Jones was charged; the other, Clanton, was an accomplice of Jones who had agreed to testify against him. The trial court examined the grand jury testimony of both witnesses. It concluded that Lawson's testimony before that body varied in some respects from his trial testimony and thus made parts of his grand jury testimony available to counsel. The court found no such inconsistencies in Clanton's earlier testimony, however, and therefore refused to permit an inspection of his grand jury testimony.

The Court of Appeals rejected that approach, as we and it had earlier in *Leonard,* for essentially the same reason. The trial judge is not in the same position as defense counsel either to discern potential inconsistencies or to evaluate their possible relevance and impact for purposes of cross-examination. Thus [297 Md.] at p. 17, 464 A.2d 977, the Court held:

> "We see no difficulty with the trial judge reviewing the witnesses' grand jury testimony and excising those matters which do not relate to the subject case, but he should not be making decisions as to what is or is not inconsistent or immaterial to the defendant's case."

Thus finding error, the Court continued [297 Md.] at p. 17, 464 A.2d 977: "We do not believe it appropriate for this Court to review the trial testimony of Clanton and Lawson for the same reasons outlined above with respect to the trial judge; not doing so, we cannot apply the harmless error rule."

From this last statement in *Jones,* it is clear that the question of whether the court's error was harmless cannot be resolved on the basis of *our* perception of Collier's grand jury testimony. For purposes of this case, we must assume that there may have been some statements therein that

were inconsistent with his trial testimony and that might have been used to impeach his credibility. That does not end the inquiry, however. We still must consider whether the presumed inability to impeach the testimony given by Detective Collier could have "played a significant role in influencing the rendition of the verdict...." The *Jones* Court was spared the need to engage in that kind of analysis because the answer in that case was obvious; the two witnesses, as noted, were critical ones to the State's case. That is not the situation here.

The case against appellant, as we have observed, rested almost entirely on the testimony of Hughes and Dawkins, which was corroborated to some extent by the physical evidence admitted prior to Collier's taking the stand. The critical issue of credibility related to their testimony, not Collier's. Collier, as we have said, did little more than identify items of physical evidence already admitted as exhibits. It is hard for us to imagine how his credibility, or lack thereof, could in any way have influenced the jury's verdict. If the jury had disbelieved everything Collier said, it would still have been left with the same physical evidence and the same testimony from Hughes and Dawkins. Appellant has not cited to us any benefit he may have derived from impeaching Collier's credibility through a showing of inconsistent testimony, and we fail to discern any.[1] *Cf. Kanaras v. State*, 54 Md.App. 568, 460 A.2d 61, *cert. denied* 297 Md. 109 (1983). On *that* basis, we are able to declare a belief, beyond a reasonable doubt, that the denial of access to Detective Collier's grand jury testimony in no way influenced the verdict, and that the error was therefore harmless.

---

1. In his brief, appellant seems to suggest that Collier's grand jury testimony may have been useful in implicating Hughes as the killer. But the testimony could not be used for that purpose. It would not have been admissible as substantive evidence. *See Chief, Montgomery County Dept. of Police v. Jacocks,* 50 Md.App. 132, 436 A.2d 930 (1981).

### (2) *False Name And Address*

In an apparent effort to show a flight from the scene of the crime, from which an inference of consciousness of guilt might arise, the State produced testimony from Addison Webster and John Hines. Mr. Webster, a principal with the District of Columbia school system, testified that appellant had been employed as an educational aide, and that, on or about January 5, 1981—the date of the shooting—appellant called him on the telephone and said that he (appellant) would not be returning to work. Mr. Hines was a detective employed by the Union, New Jersey police department. Without objection, Detective Hines stated that he had had contact with appellant in New Jersey in February, 1981, and that appellant had then identified himself as Leroy Boone and given an address in Elizabeth, New Jersey. No motion was made to strike that testimony.

In its instructions, the court told the jury:

"If you should find that the defendant did an act demonstrating a consciousness of guilt, you are permitted to infer that he did so to conceal his part in the criminal activity. Although you may not conclude that he is guilty based on acts showing consciousness of guilt alone, you may consider that along with all the other evidence, giving it such weight as you believe it deserves in arriving at your verdict.

Flight from justice or the assumption of a false name or such act, if you find that the defendant did flee and assume a false name, you may infer that his acts were aimed at concealing his part in the crime. That is, his consciousness of guilt and thus of guilt itself. You may not conclude that he is guilty based upon those acts standing alone.

However, you may consider it in light of all the other evidence, giving it such weight as you believe it deserves in arriving at your verdict."

■ Appellant argues to us now that the evidence did not suffice to support that instruction—that the giving of a

fictitious name and address in New Jersey six weeks after the event does not establish flight or a consciousness of guilt. Coupled with Mr. Webster's testimony, we think the instruction had sufficient evidentiary support. *See Davis v. State*, 237 Md. 97, 105–06, 205 A.2d 254 (1964), *cert. denied* 382 U.S. 945, 86 S.Ct. 402, 15 L.Ed.2d 354 (1965).

### (3) *State's Cross-Appeal*

The State urged the trial court to sentence appellant pursuant to Md.Code Ann. art. 27, § 643B(c), which provides, in relevant part:

"Any person who (1) has been convicted on two separate occasions of a crime of violence where the convictions do not arise from a single incident, and (2) has served at least one term of confinement in a correctional institution as a result of a conviction of a crime of violence, shall be sentenced, on being convicted a third time of a crime of violence, to imprisonment for the term allowed by law, but, in any event, not less than 25 years. . . . *A separate occasion shall be considered one in which the second or succeeding offense is committed after there has been a charging document filed for the preceding occasion.*" (Emphasis supplied.)

As a basis for the application of § 643B(c), the State established: (1) that in April, 1973, appellant had been convicted in New Jersey of armed robbery, that he had been sentenced on that conviction to eighteen years in prison, and that he had actually served a portion of that sentence before being released on parole; (2) that the current offenses were committed on January 5, 1981, and that the statement of charges and arrest warrant for them was issued the next day, January 6, 1981; and (3) that on February 20, 1981, appellant was arrested in New Jersey for an armed robbery committed there, that he was convicted of that offense in July, 1981, and that in September, 1981, he was sentenced to twenty years in prison.

Using the chronology of *convictions* as the relevant criterion, the State argued that, as the current conviction was the third, in chronological order, of a crime of violence and as appellant had actually served part of one term of confinement, the statute applied and the twenty-five year minimum sentence was mandatory. The court read the statute differently, however. To apply, it held, the third (*i.e.*, current) *offense* must have been committed after the charging documents for the first and second offenses were filed, and that did not occur here. The charging document for the second offense relied on—the 1981 armed robbery in New Jersey—was not filed until after the Maryland offense at issue here.

■ We agree with the court's ultimate conclusion, although not quite with its analysis. We think that, for the statute to apply, the current offense must post-date the two predicate *convictions,* which, in this case, it did not.

Enhanced punishment statutes such as § 643B(c) are not unique to Maryland, nor, indeed, is § 643B(c) the only enhanced punishment statute in Maryland. *See, for example,* §§ 36B, 286, and 643B(b) of art. 27. Most of the States have such statutes in one form or another, some providing for increased penalties upon conviction of a subsequent "offense," some speaking merely in terms of subsequent "convictions," some referring to prior convictions, some specifying a particular chronology, some not. But, as noted in Annot., *Habitual Criminal Statutes,* 24 A.L.R.2d 1247, 1248 (1952):

"[R]egardless of the difference in phraseology, the preponderance of authority supports the view that *the prior convictions, in order to be available for imposition of increased punishment of one as a habitual offender, must precede the commission of the principal offense, that is, the latest prosecution in point of time.* In this connection, it has been brought out in numerous cases that, although differing somewhat in language, the same principle is inherent in a habitual criminal statute, name-

ly, that the legislature in enacting such a statute intended it to serve as a warning to first offenders and to afford them an opportunity to reform, and that the reason for the infliction of severer punishment for a repetition of offenses is not so much that defendant has sinned more than once as that he is deemed incorrigible when he persists in violations of the law *after conviction of previous infractions."* (Emphasis supplied.)

The caselaw, including opinions written after the publication of that 1952 annotation, confirms the accuracy of that conclusion. *See, for example, State v. Carlson,* 560 P.2d 26 (Alaska 1977); *People v. Gennaitte,* 127 Cal.App.2d 544, 274 P.2d 169 (1954), *cert. denied* 348 U.S. 983, 75 S.Ct. 574, 99 L.Ed. 765 (1955); *People v. Nees,* 200 Colo. 392, 615 P.2d 690 (1980); *Kane v. State,* 327 A.2d 744 (Del.Supr.1974); *Joyner v. State,* 158 Fla. 806, 30 So.2d 304 (1947); *Johnson v. State,* 118 Ga.App. 448, 164 S.E.2d 353 (1968); *People v. Phillips,* 56 Ill.App.3d 689, 14 Ill.Dec. 161, 371 N.E.2d 1214 (1978); *State v. Hollins,* 310 N.W.2d 216 (Iowa 1981); *State v. Wilson,* 6 Kan.App.2d 302, 627 P.2d 1185, *aff'd* 230 Kan. 287, 634 P.2d 1078 (1981); *Boyd v. Commonwealth,* 521 S.W.2d 84 (Ky.1975), *overruled on other grounds, Payne v. Commonwealth,* 656 S.W.2d 719 (Ky.1983); *State v. Neal,* 347 So.2d 1139 (La.1977); *State v. Simmons,* 258 N.W.2d 908 (Minn.1977); *Carr v. State,* 96 Nev. 936, 620 P.2d 869 (1980); *State v. Johnson,* 109 N.J.Super. 69, 262 A.2d 238 (1970); *French v. Cox,* 74 N.M. 593, 396 P.2d 423 (1964); *Commonwealth v. Calio,* 155 Pa.Super. 355, 38 A.2d 351 (1944); *Tyra v. State,* 534 S.W.2d 695 (Tex.Cr.App.1976), *overruled on other grounds, Cooper v. State,* 631 S.W.2d 508 (Tex.Cr.App.1982); *State v. Midell,* 40 Wis.2d 516, 162 N.W.2d 54 (1968); *Gonzalez v. United States,* 224 F.2d 431 (1st Cir.1955); *cf. People v. Johnson,* 86 Mich.App. 77, 272 N.W.2d 200 (1978).[2] *See also* 39 Am.Jur.2d *Habitual Criminals, Etc.,* § 6.

---

**2.** Some of these cases involved or addressed the question of whether the prior convictions must themselves be sequential according to

There is, to be sure, a minority rule, which is the only one brought to our attention by the State. Some courts have interpreted recidivist statutes as *not* requiring the prior conviction to be rendered before commission of the instant offense. *See, for example, United States v. Bridgeman,* 523 F.2d 1099 (D.C.Cir.1975), *cert. denied* 425 U.S. 961, 96 S.Ct. 1744, 48 L.Ed.2d 206 (1976); *State v. Hannah,* 126 Ariz. 575, 617 P.2d 527 (1980); *Conley v. State,* 272 Ark. 33, 612 S.W.2d 722 (1981); *Jordan v. State,* 383 So.2d 495 (Miss.1980); *United States v. Hilliard,* 366 A.2d 437 (D.C. App.1976); *State v. Cain,* 107 N.J.Super. 215, 257 A.2d 746 (1969); 24B C.J.S. *Criminal Law,* § 1960(5). That view seems to rest on the premise that the legislative intent behind the particular statute under consideration was not to warn or reform the offender, and thus to deter future criminal activity, but simply to punish career criminals based on their record, and to protect society in that manner. The achievement of *that* end, of course, does not depend upon any particular sequence of offenses; only the sequence of convictions matters. In most of these cases, the court has discerned this alternative legislative intent from some clear legislative statement or action, such as an amendment to a prior statute. *See, for example, Conley v. State,* 272 Ark. 33, 612 S.W.2d 722, reversing *Washington v. State,* 271 Ark. 420, 609 S.W.2d 33 (1980).

The Maryland appellate courts have yet to address the question squarely.

It is difficult to judge whether, in enacting § 643B(c), the Legislature was guided more by one philosophy than another—whether its primary goal was the protection of society through deterrence, which would presuppose a sequence of offenses, or through the *ex post facto* imposition of substantial punishment based on what the court ultimately

---

offense—*i.e.,* whether the conviction for offense No. 1 must precede the commission of offense No. 2; and there is a split as to that issue. *Compare,* for example, *Gimmy v. People,* 645 P.2d 262 (Colo.1982), and *State v. Wilson, supra,* 6 Kan.App.2d 302, 627 P.2d 1185. That question is not now before us, and we need not consider it.

finds before it. The bill enacting § 643B(c) (1977 Md.Laws, ch. 678), was directed primarily at a wholesale rewriting of the "defective delinquency" law (Md.Code Ann. art. 31B) and the restructuring of Patuxent Institution. The available legislative history indicates that, in large measure, § 643B(c) was intended as a partial replacement for the previously authorized indeterminate commitment to Patuxent Institution, which the bill repealed.[3] That, in turn, would tend to suggest some mixture of both intents—deterrence/reform and secure and lengthy removal from society.

As initially enacted, § 643B(c) did not contain what is now its last sentence, defining the term "separate occasion." It provided simply that a person who (1) had been "convicted on two separate occasions" of a crime of violence where the convictions did not arise from a single incident and (2) has served at least one term of confinement as the result of a conviction of a crime of violence, shall receive the mandatory minimum sentence. As so worded, though couched in terms of "convictions" rather than offenses, absent some clear expression of legislative intent, the statute could as easily have been construed in accordance with either the majority or the minority rule.

---

**3.** *See* Memorandum of Executive to General Assembly Re Patuxent Institution (SB 452, HB 907), March, 1977. Before the 1977 enactment, art. 31B permitted persons who had been convicted, even once, of any felony or crime of violence and who were subsequently found by a court or jury (1) to have demonstrated persistent anti-social behavior and (2) to have such intellectual deficiency or emotional imbalance as to present an actual danger to society, to have their finite sentence suspended and to be committed to Patuxent Institution for an indefinite period of time, to be released only when the Patuxent Institutional Board of Review concluded that such release was "reasonably safe for society." In 1976, the Legislature had expressed grave misgivings over the continued efficacy and fairness of that approach, but agreed to defer a final decision pending further study. The 1977 enactment was a response to, and generally implemented, the recommendations of two study groups—a consultant (Contract Research Corporation) employed by the Department of Public Safety and Correctional Services and a gubernatorial Commission on Aggressive Offender Treatment.

In *Calhoun v. State*, 46 Md.App. 478, 418 A.2d 1241 (1980), *aff'd* 290 Md. 1, 425 A.2d 1361 (1981), we pointed out that § 643B(c) was ambiguous in a number of respects, and in a footnote at p. 490, suggested the need for legislative clarification. One of the problems we noted had to do with the requirement that the prior convictions occur on "two separate occasions." We observed:

> "In addition, we note that unless a defendant's two prior convictions occur on 'two separate occasions' the predicates of § 643B(c) have not been satisfied. This is true even when the two prior convictions arise from totally separate incidents. Thus, a defendant who is convicted at one trial of several crimes of violence may escape the mandatory sentence of § 643B(c). In contrast, however, the mandatory life sentence provision, § 643B(b), requires only 'three separate convictions.' It does not require that the convictions be obtained on separate occasions. These discrepancies and variations are indicative of the need for legislative clarification of the statutory enactment."

This hypothetical concern became a real problem in *Lett v. State*, 51 Md.App. 668, 445 A.2d 1050, *cert. denied* 294 Md. 442 (1982). The two prior qualifying convictions relied upon by the State there, though arising from separate crimes of violence, were entered the same day, apparently after a single trial at which the two offenses had been consolidated. Lett argued, and we agreed, that as a result, he had not been convicted "on two separate occasions," and thus § 643B(c) could not be applied. We noted the concern expressed in *Calhoun* and again invited the Legislature to consider the problem.

Unbeknown to us, the General Assembly had already taken our cue from *Calhoun* and, by 1982 Md.Laws, ch. 479, clarified the meaning of "separate occasion" by adding to § 643B(c) the statement, "[a] separate occasion shall be considered one in which the *second or succeeding offense* is

committed after there has been a charging document filed for the preceding occasion." (Emphasis supplied.) [4]

This provision was added by a House Judiciary Committee amendment to a bill whose initial and principal purpose was to include certain burglary offenses within the definition of "crime of violence" in § 643B(a). Although there is no direct legislative history available to explain the amendment, we have little doubt that it was in response to the footnote in *Calhoun*. Unfortunately, while it may have cleared up the ambiguity noted therein, in the process of doing so, it compounded the problem now before us, as it introduced into the statute for the first time as explicit criteria or measuring rods the date of the offense and the date of the charging document. Were those events intended to relate only to the prior convictions, *inter sese*, or were they intended to affect the relationship between the prior convictions and the instant one as well?

Had the Legislature not spoken in terms of the second "or succeeding" offense, the argument could well be made that it intended to address no more than the problem of two prior convictions rendered the same day, and otherwise to leave the law as it was. The introduction of the "succeeding" offense, however, makes the force of that argument somewhat less clear. The Legislature may have meant only to clarify that § 643B(c) could be invoked where there were more than two prior convictions, *i.e.*, to cover the gap where the defendant had more than two prior convictions, thus precluding the application of § 643B(b). We noted that problem as well in *Calhoun*, 46 Md.App. at 490 (n. 5), 418 A.2d 1241. But the addition of the word "succeeding" could as easily be read as expressing an intent to implicate the instant conviction as well. From the evidence available to us, we simply cannot tell.

Many of the cases adopting the majority rule stress that enhanced punishment statutes, being penal in nature, must

---

**4.** Ch. 479 was signed by the Governor on May 25, 1982, but was not effective until July 1, 1982. *Lett* was decided June 2, 1982.

be strictly construed in favor of the defendant, with any ambiguity as to meaning or application resolved in his favor. That, of course, is a common rule well recognized in Maryland. We think that it applies to § 643B(c) and, by its application, tilts the balance in favor of the accused.

We therefore align ourselves with the great majority of States and conclude that in order for a defendant to be sentenced under § 643B(c), the two convictions serving as the predicate for the enhanced sentence must precede in time the commission of the offense upon which the instant conviction is based. Deterrence, rather than retribution, is the legislative intent we shall infer; and that, as the cited authority makes clear, requires that the instant offense—the one for which the enhanced punishment is imposed—be committed after the two predicate convictions. The defendant is being more heavily punished for disregarding the statute's warning and proceeding to commit the third offense after being twice convicted on two earlier occasions. Accordingly, we find the State's cross-appeal to be without merit.

JUDGMENTS AFFIRMED; COSTS TO BE ASSESSED ONE–HALF TO APPELLANT, ONE–HALF TO MONTGOMERY COUNTY.