780 A.2d 344

**Timothy Van NIXON**

**v.**

**STATE of Maryland.**

No. 1088, Sept. Term, 2000.

Court of Special Appeals of Maryland.

Sept. 5, 2001.

Amy E. Brennan, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), both of Baltimore, for appellant.

Zoe M. Gillen, Asst. Atty. Gen., (J. Joseph Curran, Jr., Atty. Gen., both of Baltimore, and Davis R. Ruark, State's Atty. for Wicomico County of Salisbury, on the brief), for appellee.

Argued before HOLLANDER, KRAUSER, and ROBERT N. DUGAN, (Specially Assigned), JJ.

DUGAN, J.

Appellant, Timothy Van Nixon, was tried by the Circuit Court for Wicomico County, the Honorable Donald C. Davis presiding without a jury. Mr. Nixon was convicted of the following offenses and sentenced accordingly: (1) Count 1—child abuse, fifteen years with all but eight years suspended; (2) Count 2—attempted second degree rape, fifteen years with all but eight years suspended and concurrent to Count 1; (3) Count 4—third degree sexual offense, ten years with all but two years suspended and consecutive to Count 1; (4) Count 5—child abuse, ten years with all but two years suspended and concurrent with Count 4; (5) Count 8—child abuse, fifteen years with all but eight years suspended and consecutive to Count 4; and (6) Count 11—attempted second degree sexual offense, fifteen years with all but eight years suspended and concurrent with Count 8. The executed portions of the sentences totaled eighteen years. This appeal ensued and appellant presents the following questions for our review:

1. Did the trial court err in admitting complainant's statements to Catherine Beers?

2. Did the trial court err in refusing to allow defense counsel to cross-examine the complainant with Catherine Beer's notes of the complainant's statements made to her?

## Factual Background

In a twelve count indictment, the State charged appellant with multiple acts of child abuse and sexual offenses against Penny Taylor. Counts one through four relate to events that allegedly occurred on October 13, 1999. Counts five through seven relate to events that allegedly occurred on October 9, 1999. Counts eight through twelve relate to events that allegedly occurred between January 1, 1998 and October 8, 1999.

Penny Taylor, whose date of birth is January 4, 1984, was sixteen years old when she testified at trial on April 17, 2000. Carol Davis, a certified school psychiatrist employed by the Wicomico County Board of Education, testified that Miss Taylor was an intensity level four special education student who did not have the skills necessary to obtain a high school diploma. For this reason, she was enrolled in a certificate program. Further, as a result of a November 17, 1999 re-evaluation of Miss Taylor's status as a special education student, Dr. Davis concluded that the alleged victim was "intellectually deficient and mentally retarded." Numerous other tests confirmed that Miss Taylor's level of cognitive functioning was, in general, "as low as you can get" in the first or second percentile. Her IQ, at that time, was forty-six.

The Department of Social Services and the police learned of Penny Taylor's allegations of sexual abuse on October 14, 1999, after an outburst by the victim. They were contacted by the Parkside High School guidance office. At trial, Virginia Shuler, a teacher at Parkside, testified that during third period study hall, Penny Taylor was working on a cooking assignment with a male student who "was playing a little bit with her . . ." It appears that the boy "touched her on the arm or something." Ms. Shuler heard an outburst from Miss Taylor. "[S]he said 'no man's going to hurt Penny anymore.' So I called her up to my desk . . . [a]nd she told me what was on her mind." Miss Taylor confided in Ms. Shuler that "her stepfather . . . was making her do things that she didn't want to and she was specific with the things." As a direct result of this disturbing conversation, the teacher "sent [Penny] over to the guidance office to have Mr. Giddens call Social Services ." Catherine Beers, a Child Protective Services agent employed by the Wicomico County Department of Social Services, was assigned to the case. Accompanied by Trooper David Owens, she responded to the school to interview Miss Taylor.

At trial, Ms. Beers was permitted, over objection, to relate to the court everything that Penny Taylor told her during their initial interview and during a subsequent interview on November 2, 1999. Ms. Beers testified that, during their

October 14, 1999 interview, the alleged victim stated that her stepfather had been coming into her bedroom at night after her mother was asleep. Ms. Beers informed the court that she had to help Penny Taylor isolate the times that each of these events occurred by drawing a clock and having her point to the numbers that corresponded with each of her evening activities, such as bedtime. According to Miss Taylor, appellant was usually "buttnaked" when he came into her bedroom and he would "rip her clothes off, suck her breasts and suck her face ... The last incident happened the night before [the interview on] October 13, 1999." On that night, according to Ms. Beer's testimony, the defendant came into Penny Taylor's room, while

> [s]he was in her bed, laying ... underneath the covers wearing a pair of yellow zippered shorts and a Tweety bird shirt, polka dot panties and her bra.

> [Miss Taylor] stated that Mr. Nixon entered her room only wearing blue shorts and got into bed with her underneath the covers and laid on top of her. He proceeded to take her shorts off and her underwear off. She said that she was struggling at that point to try to keep her shorts on but he held her hand down so that she couldn't push him off. And she said that he stuck his middle finger up her vaginal area and she said she felt sick to her stomach.

> She described the finger as his middle finger. She said he then took his finger out of her vaginal area and inserted his penis between her legs.

> She said that his blue shorts were on the floor along with her yellow shorts and her panties. She still had her shirt and bra on.

According to the victim appellant was engaging in sexual activity with her "every single night."

During the interview process, Ms. Beers asked Miss Taylor to draw a picture of "what she would have looked like and what Appellant would have looked like when he was in bed on top of her, inserting his penis in her. And [she] had her name the body parts, which [Penny] did." At Ms. Beer's request,

Penny Taylor also drew a picture of appellant's penis. "She labeled the scrotum balls, the penis and then she said this slice thing in front of the middle of the penis and she drew that." Over objection, the drawing (State's Exhibit Number 3) was admitted into evidence. Additionally, on cross-examination, the agent testified that Penny Taylor informed her that appellant had ejaculated on the sheets during their October 13, 1999 encounter. Pursuant to a search warrant executed the following day, the police seized sheets from Miss Taylor's bed. However, Defense Exhibit Number One, the serology report, indicated that no semen was present on the green fitted sheet. Additionally, Defense Exhibit Number Two, a lab report, proved that appellant's hair did not match any of the samples found on the sheet.

Ms. Beers further testified as to another sexual encounter that had, according to Miss Taylor, occurred approximately the week before, on or about October 9, 1999.

> She said that her mother had gone out to the store. And after her mother left, Mr. Nixon came into her room and attempted to suck her breasts and put his hand between her legs. We had asked if there was anything further at that point, did he try to insert his penis in her, either vaginally or anally, but she had denied that at that point. She said that she had kicked him off and threatened to call the police.

Lori Taylor, Penny Taylor's mother, offered testimony at trial that her daughter was never alone with appellant on October 9, 1999. Rather, she stated that the entire family was together on that date.

Following the agent's testimony, Miss Taylor took the stand. She indicated that she had lived with both her mother and stepfather at two different locations. The first was Kiowa Avenue and the second was West Isabella Street. She stated that the sexual abuse had occurred at both residences on numerous occasions. During one encounter at the Kiowa address, Penny Taylor testified, "[Mr. Nixon] got on top of me in my room and took my clothes off. [He tried] to put his thing in [me]." She stated that this action felt disgusting and

nasty and she told him to stop. Despite her attempts, she could not push her stepfather off of her because "his muscle was working in his arms." Miss Taylor claimed that, during such sexual contact, she would call out for her mother and scream. However, even when the child explained what happened to her, her mother did not believe her. Several attempts to relate the abuse to her mother resulted in the same response. Penny Taylor also told an adult cousin, Towanna Nixon, about the incidents, but it is not clear what resulted from that conversation.

When questioned about what abuse had occurred at the West Isabella Street residence, Miss Taylor did not initially answer. Yet, following a series of other questions about her home, she testified that at some point appellant's penis had touched the private part between her legs as well as her "coochie" and "butt." Counsel then asked her to "tell ... about [her] butt getting touched ... what happened to [her] butt." Miss Taylor responded that her stepfather "told me to turn over and I said 'no.' And he just pulled me, like turned me over and.put his [penis] in [the front part of] me." She further related that her "butt" hurt "real bad" and that appellant had tried to put his penis in her "butt."

Dr. Goertzen, the emergency room physician who examined Miss Taylor on October 14, 1999, also testified. He stated that his examination of the girl revealed a yeast infection, a condition commonly found in sexually active women. Additionally, her hymen was no longer intact. On cross-examination, Dr. Goertzen conceded that the presence of a yeast infection and the absence of a hymen do not necessarily mean that Penny Taylor was sexually active. The doctor noted that there was neither any semen present nor any evidence of vaginal or anal trauma. Miss Taylor was not pregnant and did not exhibit any signs or symptoms of a sexually transmitted disease.

Eight witnesses, including Penny Taylor's mother, testified for the defense. Lori Taylor informed the court that her daughter was not a truthful person and that she did not

believe anything that her daughter told her. Ms. Taylor also testified that, on the morning that her daughter claimed appellant was abusing her, Penny Taylor had gotten into a fight with her stepfather.

According to Miss Taylor's hairstylist, Janet Melbourne, the complainant stated that the abuse "didn't happen" and that she told her mother that appellant had sexually abused her because she was mad at him.

Florence Nixon, Percy Thornton, and Bernadine Townsend, who all lived with Penny Taylor at various times, also testified that she was not a truthful person. In particular, Percy Thornton stated that he was a boarder at Florence Nixon's house during the time period that Penny Taylor lived with appellant. According to Mr. Thornton, Miss Taylor, during her residence there, falsely accused appellant of patting her behind.

Finally, Penny Taylor's younger brothers, Michael and Keith Taylor, both testified that their bedroom is very close to their sister's and that they never heard her screaming or crying at night.

## Discussion

### I.

Prior to trial, the State filed a written notice of its intention to offer Penny Taylor's statements made to Catherine Beers as substantive evidence that Miss Taylor had been sexually abused by the appellant. The thrust of the State's argument was that although Penny Taylor was sixteen years old, she was mentally disabled and, therefore, her prior statements to Ms. Beers were better evidence of what happened to her than her testimony at trial offered many months later. The State averred that the statements were admissible under Rule 5–803(b)(24), a residual hearsay exception that provides

Under exceptional circumstances, the following are not excluded by the hearsay rule, even though the declarant is available as a witness:

* * *

(b) Other exceptions.

* * *

(24) A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purpose of these rules and the interests of justice will best be served by admission of the statement into evidence. A statement may not be admitted under this exception unless the proponent of it makes known to the adverse party with a fair opportunity to prepare to meet it, the intention to offer the statement and the particulars of it, including the name and address of the declarant.

The State did not attempt to admit the statements under Article 27, section 775 because the complainant was sixteen years old, not under age twelve as the statute requires.

On March 3, 2000, the Honorable D. William Simpson conducted a hearing to determine whether that aforementioned hearsay exception applied to permit admissibility in this case. The court did not rule and stated that it would "withhold any ruling on any motion in limine to whatever judge can rule on the admissibility of the hearsay statement, depending on the evidence that is offered at the time of trial."

On· March 24, 2000, Judge Simpson conducted another hearing to determine "whether this statement has the particularized guarantees of trustworthiness which would allow the court to allow the State to utilize it at trial should the need arise." At this hearing the State called Carol Davis, the certified social psychologist, who testified about the complainant's limitations. Her testimony at this hearing was consistent with her later trial testimony. Specifically, Ms. Davis testified that Miss Taylor had an IQ of forty-six and a mental age of approximately six years and two months. Catherine Beers also testified in a manner consistent with her later trial

testimony. She described how she came to interview Miss Taylor, when and how the interviews were conducted, and what Miss Taylor told her about the alleged sexual abuse committed by appellant. The court declined to interview Miss Taylor in camera, despite being requested to do so by both parties.

MRS. IRELAND: Your Honor, I did—she is here and as these statutes parallel, I offer the Court the opportunity to talk with Penny if that would be of assistance.

THE COURT: I don't think it would be of assistance to the Court. You may step down. All right.

MR. LACORTE: Judge, I have heard about parallel statutes today. I'm not sure what we are talking about. The Rule under which this evidence, the hearsay testimony of the social worker is being offered is a Rule of Court. It is a catchall exception to the Hearsay Rule, and it requires that the statements—

THE COURT: Must be as to a material fact, which it is.

MR. LACORTE: Right.

THE COURT: And that—

MR. LACORTE: But it is more probative than any other evidence which the proponent can procure through reasonable efforts, and I think on that score it's a dismal failure. The State, I think it's fair to say that the State is trying to bolster its case. The Court has seen Mrs. Beers. She is a very articulate, competent social worker, and if the State is allowed to introduce hearsay through her, it is going to do an end round around Article 27, Section 775 which requires—

THE COURT: Well, it's not doing an end around it. It's being offered—it's not covered by Section 775 because the person is over twelve years of age.

MR. LACORTE: Judge, I think that statute requires that the declarant be under the age of twelve.

THE COURT: That statute does, but this is being offered under the Rule because of, obviously, that although the person is over twelve years of age, has a capacity of much

less, and, therefore, the State says that the same reasons that justify admitting hearsay under Section 775 of Article 27 exist in this case because of the mental age of the declarant. This is the State's—

MR. LACORTE: But, Judge, remember the testimony of the social worker. That the child was consistent on three separate interviews. She was able to articulate dates when this happened. She was able to give specific dates.

THE COURT: Well, she said it happened last night, and then they established with assistance that it happened on the 7th. It didn't say that—it's a far cry from saying that she was able to recite dates.

MR. LACORTE: Judge, that Article 27, Section 775 is very limited.

THE COURT: I understand. We are—it's not admissible under Section 775.

MR. LACORTE: Well, your Honor, I know you are going to hear my argument, but the last thing I would do is call your attention to the committee note for this Rule under which this hearsay is being offered. It says it is intended that the residual hearsay exceptions will be used very rarely and only in exceptional circumstances. The committee does not intend to establish a broad license for trial judges to admit hearsay statements that do not fall within one or the other exceptions.

THE COURT: I have never admitted anything under this Rule in my life. If I do, it will be very rare.

MR. LACORTE: It is a fairly new Rule, your Honor.

THE COURT: Okay.

MR LACORTE: The legislature has been very specific as to which circumstances hearsay of a child will be used in child abuse cases.

THE COURT: But this is not a child as you say because she is over—

MR. LACORTE: She is sixteen, your Honor.

THE COURT:—sixteen years of age. So what we are talking about is whether or not the Court should admit a statement of someone sixteen years of age who is very intellectually limited such that she probably cannot recite facts any better than a six-year old. That's what we are asking—

MR. LACORTE: The Court has nothing more than a proffer on that point, your Honor.

THE COURT: I have the evidence of a psychologist who gave her tests. It's something more than a proffer.

MR. LACORTE: Well, the Court hasn't heard from the child.

THE COURT: That's correct.

MR. LACORTE: And, of course, that would be required-in other words, the statute would offer the defendant that protection, which, as I understand it, the Court is not willing to afford under—

THE COURT: I said I didn't think it would be of assistance. I interviewed a child fifteen minutes ago. The thing that the Court does in determining whether—in my interviews with a child is basically questioning the child as to whether the child told the truth and whether the child understands the truth. I am satisfied from the evidence of the social workers that the interview is not going to give me much more than what the social worker gave me. I just didn't think it would be of assistance to me. All right. I think this is one of those very exceptional circumstances where an out-if-court statement would be admitted. I believe that the out-of-court statement contains guarantees of trustworthiness. I believe that because of the very mental limitations of the child as testified to by the school psychologist that the statement is probably more probative on the point than any other evidences could be cured, and that the general purpose of these Rules in the interest of justice would be best served by the admission of the statement, so the Court is going to admit the statement.

At trial, when the State sought to elicit Penny Taylor's hearsay statements to Catherine Beers, defense counsel objected and was granted a continuing objection "to all hearsay statements through this witness."

In *State v. Walker*, 345 Md. 293, 691 A.2d 1341 (1997), the Court of Appeals analyzed the applicability of Rules 5–803(b)(24) and 5 804(b)(5), which contain the residual exception to the hearsay rule.[1] The Court set out the analytical framework and stated:

[F]rom a simple parsing of Rule 5–804(b)(5), it is apparent that six conditions need to be satisfied for evidence to be admissible under that rule:

(1) the witness must be "unavailable" as defined in Section (a) of the rule;

(2) there must be "exceptional circumstances;"

(3) the statement must not be specifically covered by any of the other exceptions;

(4) it must have "equivalent circumstantial guarantees of trustworthiness;"

(5) the court must determine that (i) the statement is offered as evidence of a material fact, (ii) the statement is more probative on the point for which it is offered than any other evidence which the proponent can produce through reasonable efforts, and (iii) the general purposes of the rules and interests of justice will best be served by admission of the statement into evidence; and

(6) the proponent of the statement has given the requisite advance notice of its intention to use the statement.

345 Md. at 318–319, 691 A.2d 1341 (footnotes omitted). Element (1) is inapplicable to a Rule 5–804(b)(24) analysis. *See supra* n. 3. Appellant concedes that element (6) was satisfied.

---

**1.** The two rules are the same but for one difference, Rule 5–803(b)(24) does not require that the witness be unavailable. *See State v. Walker*, 345 Md. at 318 n. 8, 691 A.2d 1341.

▇▇▇▇

■ With respect to element (2), the requirement that the circumstances be exceptional, the Walker Court stated:

> The first prerequisite to admissibility under the Maryland residual exception, and the one that is determinative in this case, is that there be "exceptional circumstances." As we have observed, that is a condition that we added to the text of the rule; it is not in the text of the Federal rule or the rules adopted in most of the States. Following the view of the Federal Advisory Committee and the U.S. Senate, we made clear in our endorsement of the Committee Note to Rule 5–803(b)(24) what we meant by "exceptional circumstances"—"new and presently unanticipated situations...."[2]

*Id.* at 325, 691 A.2d 1341. The Court continued, "The residual exceptions, limited by the 'exceptional circumstances' condition, were intended for those rare situations that were not anticipated." *Id.* at 326, 691 A.2d 1341. "The fact that the evidence at issue may have equivalent, or even superior, circumstantial guarantees of trustworthiness does not alone suffice to warrant admission under the Maryland residual exception." *Id.*

---

**2.** The Committee Note provides:

The residual exceptions provided by Rule 5–803(b)(24) and Rule 5–804(b)(5) do not contemplate an unfettered exercise of judicial discretion, but they do provide for treating new and presently unanticipated situations which demonstrate a trustworthiness within the spirit of the specifically stated exceptions. Within this framework, room is left for growth and development of the law of evidence in the hearsay area, consistently with the broad purposes expressed in Rule 5–102.

It is intended that the residual hearsay exceptions will be used very rarely, and only in exceptional circumstances. The Committee does not intend to establish a broad license for trial judges to admit hearsay statements that do not fall within one of the other exceptions contained in Rules 5–803 and 5–804(b). The residual exceptions are not meant to authorize major judicial revisions of the hearsay rule, including its present exceptions. Such major recessions are best accomplished by amendments to the Rule itself. It is intended that in any case in which evidence is sought to be admitted under these subsections, the trial judge will exercise no less care, reflection, and caution than the courts did under common law in establishing the now-recognized exceptions to the hearsay rule.

The circumstances in this case are not exceptional, rare, or unanticipated. The State's evidence showed that sixteen-year-old Penny Taylor had an IQ of forty-six and a mental age of six years and two months. Judge Simpson found that her ability to relate to events at trial would be no better than that of a six-year-old.

In *Walker, supra,* the Court of Appeals held that it is not unanticipated that witnesses will invoke the marital privilege, and noted the existence of statutes that address that issue. 345 Md. at 327–329, 691 A.2d 1341. Likewise, admission of out-of-court statements of alleged child abuse victims is plainly anticipated and the legislature has crafted a detailed statute that addresses same.[3] Article 27, section 775 spells out the requirements that must be satisfied before a court can admit into evidence "an out-of-court statement, to prove the truth of the matter asserted in the statement, made by a child victim under the age of twelve years...." The fact that this statute exists belies the notion that the circumstances in this case are exceptional. This type of statement is specifically covered by another exception. Article 27, section 775 sets forth specific limitations on the admission of such hearsay statements and provides protections to an accused against whom the hearsay statement(s) will be offered. The statute is only applicable in cases where the child making the statement is under twelve years old. The legislature could have provided for admission of statements of individuals with a mental age of twelve years or younger, but it did not.[4] Similarly, the legislature could have provided for the admission of statements of individuals sixteen or younger, but they did not. The statute provides that the court "shall conduct an in camera examination of a child prior to determining the admissibility of the statement ..." *See* Article 27, section 775(f). In this case, the court declined to

---

3. Article 27, section 775, was originally codified as Courts and Judicial Proceedings Article, section 9–103.1, which took effect July 1, 1988.

4. *See, e.g.,* Article 27, section 461(b)(c), 463(a)(2), 464A(2) and 464B(a)(2); these sexual offense sections of the Code provide special consideration for mentally defective and mentally incapacitated victims.

interview Penny Taylor, stating, "I didn't think it would be of assistance to me." By admitting Penny Taylor's statements to Catherine Beers under Maryland Rule 5-803(b)(24), the court ignored the limitations and protections in Article 27, section 775 and expanded the already existing exception to fit the specific facts of the State's case.[5] The existence of section 775 clearly demonstrates that the situation presented by this case was anticipated by the legislature and, consequently, is not exceptional. The legislature resolved the issue presented in this case in a way that makes the complainant's statements inadmissible.

Element (4) requires that the hearsay statement have circumstantial guarantees of trustworthiness equivalent to those exceptions to the hearsay rule enumerated in Rule 5-803(b)(1)(23). The following facts suggest that the statements did not satisfy this requirement: (a) the complainant had an IQ of forty-six; (b) her own mother testified that the complainant was a liar; (c) although the complainant denied it, there was testimony that she had an argument with Mr. Nixon on the morning she made the allegation; (d) there were inconsistencies between the first and second statements regarding the allegations of anal intercourse and attempted fellatio; (e) there was no corroborating medical evidence— according to Dr. Goertzen, the absence of a hymen and the yeast infection were not necessarily the result of sexual abuse; (f) neither Mr. Nixon's hair nor semen were found on the bed sheet where the complainant alleged he had ejaculated; and (g) Janet Milbourne testified that the complainant told her that the abuse had not occurred, that she was mad at Mr. Nixon and that was why she made the allegation.

Element (5) requires that the court determine whether the statement is offered as evidence of a material fact. Appellant

---

5. At times during the hearing on March 24, 1999, the State admittedly confused the statute and the Rule as this colloquy demonstrates:

STATE'S ATTORNEY: Your Honor, I am trying to establish that the defendant had an opportunity to commit the crime. I am required to do that under the statute.

THE COURT: Not under this Rule.

agrees that it is and the trial court so found. However, the hearsay statement is not "more probative on the point for which it is offered than any other evidence which the proponent can produce through reasonable efforts." Miss Taylor's live trial testimony, subject to cross-examination, was the most probative evidence. But for a short recess taken at the beginning of her testimony, the witness did not appear to have any problem understanding and answering questions. She withstood cross-examination and the State even called her as a rebuttal witness. The general purpose of the rules and the interests of justice were not best served by admitting the complainant's out-of-court statements. In doing so, the trial court circumvented the narrowly defined hearsay exception in Article 27, section 775.

In rendering its guilty verdict as to counts one, two, and four, the lower court stated:

Now, as to counts one through four, this relates to occurrences on October 13, 1999 and in this regard, I'm really basing these verdicts on the in-court testimony of Penny Taylor. And without recounting the testimony, I will simply say that it satisfied me beyond a reasonable doubt that Mr. Nixon is guilty of abuse under count one, is guilty of attempted second degree rape under count two, and is guilty of third degree sex offense under count four.

Now, with respect to count three, which is a charge of third degree sex offense, I don't believe that there was sufficient testimony on that point, I'm not sure if there was any testimony that would establish that but certainly not beyond a reasonable doubt and so I'll enter a not guilty verdict as to count three.

Now, the other thing I will say in regard to this is that with respect to the charges of count one, two and four, to the extent that any of those offenses relate to or can be found in these acts against the consent of Penny Taylor, I find from the testimony that notwithstanding any mental deficiency or disability that she had, that it did not preclude her from objecting to any actions and find that she expressly did not give consent. And that in this regard also that she resisted

these actions as best as she was able considering her age, condition, physical and mental.

So to the extent that it's a mental deficiency versus consent, in those regards I find that it doesn't really matter which it is from the State's standpoint, they have established both.

Clearly, the trial court relied on all of the evidence in finding the appellant guilty of counts five, seven, eight, and eleven.

■ The error in admitting Penny Taylor's hearsay statements through Ms. Beers requires reversal of counts five, seven, eight, and eleven, as Ms. Beers corroborated and bolstered Miss Taylor's testimony. This error is clearly not harmless beyond a reasonable doubt.

■ In *Johnson v. State*, 23 Md.App. 131, 138–139, 326 A.2d 38 (1974), this Court noted that "where trial is by jury, all reasonable doubts as to the effect of erroneously admitted evidence upon the jury in the determination of guilt must be resolved in favor of the objecting party." *Johnson, supra,* was cited by the Court of Appeals in *Dorsey v. State,* 276 Md. 638, 657, 350 A.2d 665 (1976), which enunciated the test for harmless error in a criminal case.

We conclude that when an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed "harmless" and reversal is mandated. Such reviewing court must thus be satisfied that there is no reasonable possibility that the evidence complained of—whether erroneously admitted or excluded—may have contributed to the rendition of the guilty verdict.

The *Dorsey* case, *supra,* along with *Cole v. State,* 83 Md.App. 279, 574 A.2d 326 (1990), *Dorsey,* 276 Md. at 659, 350 A.2d 665, which were set forth in appellant's brief both involved jury trials.

An analysis of appellate decisions in Maryland on the issue of whether error was harmless or not harmless demonstrates a clear distinction between jury trials and bench trials. Deference has always been given to a trial judge's specific statement on the record that the court was not considering certain testimony or evidence. *See Williams v. Higgins*, 30 Md. 404, 407 (1869).

We cannot, with this part of the record before us, containing the solemn statement of an able and intelligent Judge, assume that he was in any manner influenced by the testimony in question, and that the appellant was in any way more prejudiced than if it had never been admitted.

*Id.* In a bench trial the issue is whether or not the trial judge relied on improper evidence. A clear distinction is demonstrated between N*apier v. State*, 7 Md.App. 667, 670, 256 A.2d 819 (1969), where the trial judge stated that he relied on improper evidence, and *Davis v. State*, 8 Md.App. 327, 329, 259 A.2d 567 (1969), where the improper evidence was sought out by the judge's own inquiry, as compared to *State v. Hutchinson*, 260 Md. 227, 271 A.2d 641 (1970). In *Hutchinson*, the trial judge found a criminal defendant guilty of murder and rape after stating on the record that he was completely disregarding the confession in its consideration of the case. This Court reversed that conviction because the mere knowledge of the confession was before the fact finder. In reversing, the Court of Appeals observed:

The fact remains that in the instant case the Court of Special Appeals looked no further than to Judge Cole's [6] role as a trier of facts and emphasized that "We think the facts of this case are such that the mere knowledge of the substance of the confession by the trier of fact necessarily tended to deprive appellant [accused] of his constitutional right to a fair trial." . . .

---

6. Judge Harry A. Cole served on the Supreme Bench of Baltimore City, now the Circuit Court for Baltimore City, and subsequently on the Court of Appeals.

This assumption of the court might be valid were we to first, not believe the trial judge's statement that he was disregarding and eliminating from his deliberations the substance of the inadmissible confession, and, secondly, choose to ignore the professional expertise, experience, and judicial temperament with which our legal system has inherently invested a trial judge *vis a vis* a jury comprised of laymen. It is true that judges, being flesh and blood, are subject to the same emotions and human frailties as affect other members of the specie; however, by his legal training, traditional approach to problems, and the very state of the art of his profession, he must early learn to perceive, distinguish and interpret the nuances of the law which are its "warp and woof."

The rationale of the opinion of the Court of Special Appeals in reversing the judgment of the trial judge in this case leads to but one conclusion and that is that in no instance where a trial judge hears a pre-trial motion to suppress evidence could he try the case on its merits.

Furthermore, although it is true that the Court of Special Appeals was disturbed by the fact that the trial judge in this case learned of the details of the inculpatory statement, the rationale, if one accepts the court's original premise, might apply equally to any judge who had learned of the mere existence of the statement. Any judge who has read the opinion of the Court of Special Appeals (and we assume that they all have) has learned at least that there was an inculpatory statement made by the accused in this case. This would be knowledge which, if learned by a jury, would be grounds for a mistrial. If we were going to equate the role of the trial judge solely with that of the jury as trier of facts (as we believe the Court of Special Appeals did in its opinion), how then would any judge be found who would not be disqualified from hearing this case on remand? In such an event, the anomalous situation would result in which it would become virtually impossible to give the accused a fair trial, except by a jury. This would frustrate the accused's election of a trial by court.

We should keep in mind the fact that nowhere in its opinion does the Court of Special Appeals state that, absent the inadmissible confession, there was not sufficient evidence to support the judgment of the trial judge.

*Id.* at 232–34, 271 A.2d 641 (citation omitted). In the case *sub judice*, based on the clear and unequivocal statement by the trial judge, we find the error harmless beyond a reasonable doubt with regard to counts one, two, and four. As to counts five, seven, eight, and eleven, because the trial judge apparently relied on all of the evidence, the error is not harmless beyond a reasonable doubt.

## II.

During her two interviews with Penny Taylor, Catherine Beers took "notes" which included direct quotes from Miss Taylor. When Ms. Beers testified, defense counsel made use of the notes to cross-examine her. At the conclusion of her testimony, defense counsel made use of the notes to cross-examine Penny Taylor.

At the end of Ms. Beers' testimony and prior to Miss Taylor being called to testify, the following transpired:

DEFENSE COUNSEL: Judge, if the witness is going to be excused I would just ask that she leave her notes with the Court.

THE COURT: Why would she need to do that?

DEFENSE COUNSEL: Well, I would like to be able make use of them in my cross-examination of Penny Taylor.

THE STATE: That would be entirely inappropriate. She didn't take the notes.

THE COURT: No, I don't think that that's—I don't think I have that authority.

DEFENSE COUNSEL: I just would point out those notes contain memoranda of statements made by Penny Taylor. I'd just like the record to reflect that and I believe that I'm entitled to have them when I cross-examine Penny Taylor.

THE COURT: They contain Ms. Beers' notes of a conversation with Penny Taylor. Isn't that correct?

DEFENSE COUNSEL: That's correct.

THE COURT: I'm going to deny that request.

In *Carr v. State*, 284 Md. 455, 397 A.2d 606 (1979), the Court of Appeals held that, following direct examination, upon request, defense counsel must be allowed to inspect prior statements of the State's witnesses for purposes of cross-examination. As this Court noted in *Leonard v. State*, 46 Md.App. 631, 637–638, 421 A.2d 85 (1980), *aff'd*, 290 Md. 295, 429 A.2d 538 (1981),

> *Carr* makes clear beyond a question that a defendant's right, at trial, to inspect the prior statement of a State's witness who has testified is not necessarily limited (1) by the rules pertaining to pretrial discovery, or (2) the statements that are merely exculpatory. When confronted with the actual testimony of a critical witness and the knowledge that the witness has given a prior statement bearing on a material issue in the case, counsel is not engaged in a mere "fishing expedition" in seeking access to the prior statement. At that point, it becomes more than a matter of casting a seine over the State's files to see what turns up, but of directly confronting the witness; and the statement thus assumes a specific importance and relevance beyond its general value for trial preparation.... The test clearly is whether the statement is, or may be, inconsistent with the witness' trial testimony, and thus usable in cross-examination.

■ For purposes of applying the rule of *Carr*, a "statement" under Maryland law is one given by a witness under the circumstances set forth in the Jencks Act, 18 United States Code, Section 3500(e), which defines "statement" as follows:

(1) a written statement made by said witness and signed or otherwise adopted or approved by him;

(2) a stenographic, mechanical, electrical, or other recording, or a transcript thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or

(3) a statement, however taken or recorded, or a transcript thereof, if any, made by said witness to a grand jury.

At issue is whether Miss Taylor's statements to Catherine Beers meet the definition of a statement under paragraph two. Paragraph one relates to statements written by a witness, while the second paragraph relates to the witness' oral statements recorded and transcribed by another person.

In reviewing the legislative history, the Supreme Court in *Palermo v. U.S.*, 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287, (1959), determined that paragraph two goes beyond mechanical or stenographic statements, but once beyond that point, a very restrictive standard is to be applied. The Fifth Circuit Court of Appeals in *U.S. v. Cuesta*, 597 F.2d 903, 913–914 (5th Cir.1979), *cert. denied*, 444 U.S. 964, 100 S.Ct. 451 (1979), held that occasional verbatim recitation of phrases used by the person interviewed are not sufficient to satisfy paragraph two.

■ The definitions used by Congress were clearly intended to describe material that could reliably and fairly be used to impeach the testimony of a witness. The statement must fairly reflect fully and without disruption the witness' own words. *Goldberg v. U.S.*, 425 U.S. 94, 112–113, 96 S.Ct. 1338, 47 L.Ed.2d 603 (1976) (J. Stevens, concurring) (citing *Palermo v. U.S.*, *supra* at 352–353, 79 S.Ct. 1217).

■ When an interviewer or government agent interviews a witness and takes contemporaneous notes of the witness' responses, the notes do not become the witness' statements, despite the note taker's best efforts to maintain accuracy. *U.S. v. Roseboro*, 87 F.3d 642, 645 (4th Cir. 1996), *cert. denied*, 519 U.S. 1060, 117 S.Ct. 694, 136 L.Ed.2d 617 (1997).

Appellant's trial counsel requested Ms. Beer's "notes" to cross-examine Penny Taylor. No proffer was made to the trial judge that these "notes" were a substantial verbatim recital of any oral statement. Catherine Beers testified that she and Trooper Owens interviewed Penny Taylor on October 14, 1999 and on November 2, 1999. She indicated that she took "notes" on both occasions. The fact that Ms. Beers used some

direct quotes of Penny Taylor, such as, "The white stuff came out of the slit thing," and also had the victim draw and label some anatomical drawings, is not sufficient to elevate these "notes" to the level of a "substantial verbatim recital."

■ Even though the proffer of evidence by appellant's trial counsel was not sufficient, we think the better practice would have been for the lower court to make an in camera inspection of the notes to determine if Catherine Beers made a substantial verbatim recital of Penny Taylor's oral statements. However, any error with regard to this issue or any error in refusing to permit defense counsel to have the notes during cross-examination of the victim, is clearly harmless beyond a reasonable doubt. Appellant's trial counsel utilized Ms. Beers' notes during her cross-examination and was well aware of the contents of those notes when he cross-examined the victim.

**JUDGMENT AFFIRMED AS TO COUNTS ONE, TWO AND FOUR; JUDGMENT REVERSED AS TO COUNTS FIVE, SEVEN, EIGHT AND ELEVEN; CASE REMANDED TO THE CIRCUIT COURT FOR WICOMICO COUNTY FOR FURTHER PROCEEDINGS IN CONFORMITY WITH THIS OPINION; COSTS TO BE PAID BY APPELLANT.**